IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted On Briefs February 16, 2011

**IN RE JOSHUA S.**

**BRYAN L. AND ROBIN L.**
**v.**
**JENNIFER N.C. AND JOSHUA M. S.**

**Appeal from the Juvenile Court of Anderson County**
**J-26758    Brandon K. Fisher, Judge**

**No. E2010-0133-COA-R3-PT-FILED-JUNE 16, 2011**

This appeal involves the termination of parental rights. The State removed the child at issue from the custody of the parents due to neglect, parental absence, and underlying substance abuse. The child was ultimately placed with the petitioner foster parents. Subsequently, the biological parents moved out of Tennessee. The foster parents later filed a petition to terminate the parental rights of the biological mother and father, as a predicate to adoption. The trial judge terminated the parental rights of the biological parents on the grounds of persistent conditions and abandonment by failure to provide a suitable home, failure to visit, and failure to support. The mother and father appeal. We reverse on the grounds of persistent conditions, abandonment by failure to pay support, and abandonment by failure to provide a suitable home. However, we affirm on the ground of abandonment by failure to visit and affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**in Part and Reversed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Laura S. Hash, Law Office of Laura S. Hash, Clinton, Tennessee, for Petitioner/Appellees Bryan L. and Robin L.

Brian J. Hunt, Clinton, Tennessee, for Respondent/Appellant, Jennifer N.C.

David K. Vander Sluis, Oak Ridge, Tennessee, for Respondent/Appellant, Joshua M.S.

Amy Brown, Knoxville, Tennessee, Guardian Ad Litem.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Respondent/Appellants Jennifer N.C. ("Mother") and Joshua M.S. ("Father") are the parents of the minor child at issue in these proceedings ("Joshua"), born on April 6, 2007.[1] On the morning of May 23, 2008, while Father was out of town, Mother used painkiller drugs and then left the child alone in her home to go to a neighbor's home. She was arrested and incarcerated, and later pled guilty to felony child neglect.[2]

As a result, the Tennessee Department of Children's Services ("DCS") took Joshua into protective custody. The child was temporarily placed in the custody of neighbors until Father returned home. When Father returned, however, he failed a drug screening, testing positive for cocaine.[3] Joshua was found dependent and neglected by the Juvenile Court for Anderson County, Tennessee ("Juvenile Court"). The child was then placed with Father's cousin ("Cousin"). Joshua stayed in Cousin's custody until late summer 2008; Cousin had to relinquish custody of Joshua at that point because her husband was transferred in the course of his military duty.

While Joshua was in Cousin's custody, Cousin had contact with friends, a married couple willing to act as foster parents for Joshua after Cousin relocated. To facilitate this, Cousin's friends ("Foster Mother and "Foster Father" or, collectively, "Foster Parents") began meeting and interacting with the child. In August 2008, with approval from DCS and the Juvenile Court, the child was placed in the care and custody of the Foster Parents.

---

[1]The record seems to indicate that Mother and Father married shortly before the trial in this cause.

[2]At the time, Mother was already on probation for another offense. After pleading guilty to felony child neglect, Mother later pled guilty to prescription fraud.

[3]Mother's drug screen was disregarded, as she apparently attempted to substitute toilet water for her urine sample.

Meanwhile, in June 2008, DCS adopted a permanency plan for Joshua. The permanency plan required Mother and Father to obtain alcohol and drug ("A&D") assessments and follow the A&D recommendations. In addition, it required Mother and Father to complete parenting classes, and to maintain suitable housing, employment, and transportation. The plan also required Mother and Father to pay child support for Joshua. Under the plans, Mother and Father were permitted to have supervised visitation with the child provided they obtained a clean drug screen, plus twice weekly telephone calls. DCS explained the criteria for termination of parental rights to Mother, including the fact that failure to visit the child for four months or failure to pay child support could constitute grounds for termination.[4] Mother subsequently signed the initial permanency plan and the criteria for termination of parental rights.

From June 2008 until December 2008, Mother and Father exercised some visitation, with supervision by DCS or a private provider. The regularity of these visits during this time period is unclear in the record. During this time, DCS facilitated A&D assessments for Mother and Father, drug screens that were a prerequisite for visitation, and their visitation with Joshua, at times providing transportation. The drug screen results were uneven during this time period; each had several positive drug screens, with some explained by prescriptions for medication and some not. The parents' drug dependency involved prescription pain medication, cocaine, methamphetamine, and other drugs.[5]

In December 2008, both Mother and Father were present for the staffing of a revised permanency plan, with requirements similar to the initial plan. Both parents signed the December 2008 permanency plan and the criteria for termination of parental rights. The DCS case worker subsequently facilitated drug screenings and supervised visitation. DCS provided Mother and Father with information concerning parenting classes, a letter to assist Mother and Father with a housing application, and funded a private provider to further assist Mother and Father. Mother and Father failed to complete the parenting classes at that time.

In December 2008, Mother and Father decided to move to South Carolina to be closer to Mother's family for support. At the time, Mother was pregnant. DCS explained to Mother and Father the importance of visitation, made much more difficult because of the distance between South Carolina and the Foster Parents' home. Nevertheless, Mother and Father believed relocation would provide them a better support system and more resources. For a

---

[4]Father did not sign the initial permanency plan, but the DCS case manager at the time later testified that he was at the permanency plan hearing.

[5]Father tested positive for amphetamine, methamphetamine, opiate, and cocaine. Mother tested positive for methamphetamine and opiate.

time, the DCS case manager maintained regular telephone contact with Mother and Father, providing them with information regarding parenting classes and obtaining a home study through the South Carolina Department of Social Services. DCS also continued to visit Joshua at Foster Parents' home.

After moving to South Carolina, Mother and Father traveled to Tennessee and visited the child in January, February, and March of 2009. Their youngest child was born in March 2009.

In March 2009, the Juvenile Court held a hearing to review Joshua's placement and the progress of both Mother and Father. The Juvenile Court heard from Mother, Father, the child's guardian ad litem, and DCS representatives. It found that Mother and Father were not in full compliance with the permanency plan and that foster care remained necessary. The child was released from DCS custody and placed in the custody of the Foster Parents. Mother and Father were permitted supervised visitation, with a clean drug screen the same day. The order stated that the issue of child support was "reserved for later hearings until such time that the child support enforcement authorities may be present and pursue child support if they so desire."

After that, Mother and Father traveled to Tennessee every few months in order for Mother to meet with her probation officer. However, no visits with Joshua occurred during these trips.

On September 21, 2009 the Foster Parents filed a petition in the Juvenile Court to terminate the parental rights of both Mother and Father, in order to adopt Joshua. The petition sought termination on the grounds of abandonment by failure to visit, failure to support, failure to provide a suitable home, and persistent conditions. The Foster Parents asserted that Mother and Father had not visited Joshua since March 12, 2009, and had not paid child support for the four-month period preceding the filing of the petition. As persistent conditions that prevented Joshua's safe return to Mother's and Father's home, the Foster Parents alleged that Mother and Father were not compliant with substance abuse treatment recommendations, failed to maintain stable housing and employment, and failed to complete parenting classes.

Subsequently, a guardian ad litem was appointed for the minor child.[6] Both Mother and Father were deemed indigent, and separate counsel was appointed for each. Mother and

---

[6]Although the October 12, 2009 order appoints a guardian ad litem for Joshua, the Juvenile Court's earlier March 29, 2009 order refers to the same guardian ad litem as being present for the hearing on continued foster care.

Father each filed responses denying the allegations. Discovery ensued. Beginning in late fall 2009, Father's paycheck was garnished for back child support.

The trial on the Foster Parents' petition to terminate was conducted on March 23 and March 25, 2010. Although the DCS was not a party to the litigation, some DCS case workers who had been assigned to the case testified. The Juvenile Court also heard testimony from Mother, Father, and Foster Parents.

Initially, the Juvenile Court heard from the three DCS case workers, who described their contacts with the family, the staffing of Joshua's permanency plans, the explanation of the termination criteria to Mother and Father, and the course of their visitation with Joshua. The last DCS worker, Katie Butler ("Butler"), had responsibility for the case from May 27, 2008 to March 27, 2009. She described efforts to facilitate permanency plan requirements such as A&D assessments, parenting classes, drug screens, and visitation. She sometimes transported Mother and Father for visits with Joshua and provided the required supervision for the visits. She said that Mother and Father "would try to visit on a regular basis. They did cancel and reschedule a lot, but for the most part they maintained contact" with DCS. Some visits with Joshua did not occur because either Mother or Father, or both, had a positive drug screen. Mother and Father both admitted to Butler that they had substance abuse problems.

When Mother and Father made the decision to move to South Carolina, Butler said, she cautioned them that the distance would make visitation with Joshua "very hard." She said they understood, but felt it was important to move to where they had more family and better resources.

After Mother and Father relocated, Butler stayed in contact with them by telephone. Asked about their visitation with Joshua after the child exited from DCS custody in March 2009, Butler said that they came to Tennessee to visit Joshua in January and February 2009. In April 2009, Mother told Butler they could not visit because they could not afford the drug screens that were required in advance of every visit. Later, Mother called Butler to express anger over Butler's testimony to the Juvenile Court that Mother and Father had not visited and were not compliant with the permanency plan.

Butler also visited Foster Parents to do a home study on their home. She said that the Foster Parents' home was appropriate and they seemed well-bonded with Joshua. Butler commented that Joshua "was not comfortable" with her. She explained that every time she saw Joshua, even out of the presence of Mother and Father, "he would just be petrified . . . because I supervised the visitation with them."

After completion of the testimony of the DCS case workers, Mother testified. Initially, she explained the incident that led to Joshua's removal from her custody. She acknowledged that she had taken pain medication that morning, but described the incident as an isolated occasion on which she went to a neighbor's home to use her telephone while Joshua was asleep in his crib. She pled guilty to child neglect and was incarcerated for nineteen days. Mother also received one year probation for the child neglect charge; however, at the time of trial she remained on probation because of a subsequent offense of prescription fraud and failure to pay accumulated court costs. The terms of her probation required her to return to Tennessee every three months to report in person to her probation officer.

Mother also explained the reasons why she and Father moved to South Carolina. Mother explained that, in Tennessee, they remained around friends they had made while in active addiction, and that she and Father were "trying to get away from that . . . [and] better ourselves." In Tennessee, they were near Father's family, but Father's family members provided "[n]o support whatsoever." Mother said she and Father were "getting nowhere" in Tennessee. Mother's family in South Carolina offered support and assistance to them in staying off drugs and completing the requirements of Joshua's permanency plan, so they decided to relocate.

Mother said that their decision to move to South Carolina was a good one because they were able to "live a Christian life . . . a clean and stable life." She testified that she and Father no longer have any contact with drug users, and that both she and Father were employed full-time by Kraft Foods. Mother testified that she and Father paid rent for a two bedroom home in South Carolina owned by her cousin and that they both have vehicles that, although older, worked properly. Both were enrolled in parenting classes. They were raising their youngest child, born in March 2009, and an older child as well.

Mother said that in the summer of 2009, she completed a six-week outpatient alcohol and drug treatment program that she attended two to three times each week. The substance abuse treatment program for both Mother and Father included methadone treatments and random monthly drug screens. The drug screens did not test for methadone. Mother testified that she started on a methadone dosage of five milligrams and increased to ten milligrams.

After Mother and Father moved to South Carolina, Mother could not remember whether she and Father visited Joshua in March 2009 because she was hospitalized and gave birth to their youngest child with Father on March 30, 2009. In April 2009, Mother and Father came to Tennessee for Mother's report to her probation officers, but were unable to visit Joshua because they did not have the funds to secure the prerequisite drug screens. No visitation occurred in May or June 2009. Mother conceded that, in fact, she and Father "didn't have any visit with Joshua for quite a few months up until January" of 2010. The next visit after

that was in March 2010. Mother testified that she brought candy and small gifts to the visits, and that the visits went well. Mother said she had telephone contact with Foster Mother via text messages twice a week.

Asked about child support, Mother asserted that the child support she and Father owed from the time in which Joshua was in DCS custody had been paid off. She admitted that she had not paid any child support to the Foster Parents. She said that she did not need to be told to support her child, but said that she had not been ordered to pay child support to the Foster Parents, nor had she received any documentation telling her that she was supposed to pay child support to them.

Father testified as well. Father maintained that their relocation to South Carolina was a good decision, necessary for them to better their lives and ultimately regain custody of Joshua. Father acknowledged that moving to South Carolina made visiting the child more difficult. Father noted that in July 2009, while in South Carolina, he completed the alcohol and drug assessment and treatment program required under the permanency plan. As part of his ongoing treatment, Father testified, he took regular methadone treatments. From February 2009 onwards, he had regular drug screens with negative results. Similar to Mother's drug screens, Father's drug screens did not test for methadone. Father said he was taking fifteen milligrams of methadone.

Father stated that, in South Carolina, he was employed full-time with Kraft Foods. He said that he and Mother had a stable home and reliable transportation in South Carolina.

Father testified that he understood from the staffing of the DCS permanency plan and the explanation of the termination criteria that a failure to visit Joshua for more than four months or a failure to pay child support for more than four months could result in the termination of his parental rights. He conceded that he did not see Joshua from March 2009 until January 2010. Father said that he had very little phone contact with Joshua because the child was so young, and because he had been told that Joshua became upset after their visits and telephone calls. Father noted that he and Mother did not have established parenting time but had to contact the Foster Parents to arrange it. On several occasions in 2009 when they called about visiting Joshua, he said, the Foster Parents prevented visitation by telling Mother and Father that the child was sick or unavailable.

Father acknowledged that he had not paid child support directly to the Foster Parents. He testified that he did not understand that he had an obligation to pay child support until he received notification that he owed the government past due child support and his wages from Kraft Foods in South Carolina were garnished, beginning in approximately October 2009. The garnishment continued through the time of the trial. Father believed that the monies

garnished from his wages satisfied any court-ordered child support obligation.  He also understood, however, that the garnished monies did not go to the Foster Parents.

After Father testified, the Juvenile Court heard testimony from Cousin, who took temporary custody of Joshua immediately after he was removed from his parents' custody.  She said she was greatly concerned about Joshua when she first received him:

> He [Joshua] was dirty.  He was – I – when I first put him in the bathtub, he was petrified of water, so I had to crawl in the bathtub with him with my clothes on.  Very detached.  He did not smile.  He did not know how to eat.  He had one outfit, and it was May, and it was a flannel shirt and a pair of pants.  He had no diapers.  I mean, I brought him home with nothing.  He just – he wouldn't love on you.  He was – didn't like women.  Scratched, bit, pulled hair.

She said that she took Joshua to a physician because he was behind on his vaccinations.  Joshua was very small for his age.  Thirteen months old at the time, Joshua did not know about food or how to use a "sippy cup."[7]

Soon after Cousin took temporary custody of Joshua, she brought the child to a park for visitation with Mother.  She described his reaction during the visits and afterward: "[H]e didn't really have much to do with her, but it was after visitations he didn't sleep.  You – you would spend a couple of nights up with him because he – I mean, he was nervous."  Cousin introduced Joshua to the Foster Parents and facilitated a gradual transfer of custody to them.  She said Joshua was bonded with the Foster Parents and it was in his best interest to be adopted by them.

The Juvenile Court then heard from the petitioner Foster Parents.  Consistent with Cousin's testimony, Foster Mother said that when they took custody of Joshua on August 11, 2008, he was very small for his age and was unaccustomed to the textures of food.[8]  At first, she said, Joshua "would bite and pull your hair and slap you.  He didn't like women at all, but it took about six months for him to get warmed up to me. . . ."  Once he became comfortable with Foster Parents, Foster Mother said, Joshua became "a normal child" and "a happy little boy."

---

[7]Joshua was born with a cleft palate, which was surgically repaired approximately a month before he was taken into protective custody.  No expert testimony was presented on the effect of the cleft palate on Joshua's eating, size, or development.

[8]Foster Mother attributed Joshua's difficulties with food in part to his prior cleft palate.

Foster Mother's description of Joshua's reaction to visits with Mother and Father was also consistent with Cousin's testimony. Before Mother and Father relocated to South Carolina, Foster Mother said that DCS facilitated Joshua's visits with his biological parents approximately every two weeks. After each visit, she said, "there was a lot of anger and hostility. He would always bite and pull hair. It was just – it was continuous." After each visit, Joshua would not eat, had nightmares, and had difficulty adjusting to his nightly routine. Despite these problems, Foster Mother said, the only visit she cancelled was one occasion, while Mother was pregnant, when Joshua had a "stomach bug."

After Mother and Father relocated to South Carolina, Joshua was transferred from DCS custody to the custody of the Foster Parents. At that point, Foster Mother said, visits between Joshua and his biological parents were not regularly scheduled nor facilitated by DCS; instead, the visits were arranged by agreement of the parties, provided that Mother and Father had clean drug screens. Foster Mother denied that she impeded the biological parents' visitation with Joshua or dodged their telephone calls. To the contrary, she said, if Mother and Father called to schedule visitation, she was always agreeable unless she or Foster Father were at work. She stated that neither Mother nor Father asked to set specific times for consistent visitation with the child. Instead, Mother "would call frequently and set up a visitation, and then they'd turn around and cancel it because one of them couldn't get off or they couldn't do it because of the weather or something."

Consistent with the testimony of both Mother and Father, Foster Mother testified that no visits with Joshua occurred from March 2009 until January 2010. Some visits during that time were scheduled, but Mother and Father cancelled them. When Mother traveled to Tennessee in November 2009 for her probation appointment, Foster Mother said, she scheduled a visit with Joshua and then cancelled it, saying that she "was very tired and she was going home."

In January 2010, Foster Mother testified, Mother and Father came to Tennessee for a probation appointment and visited Joshua during the same trip. After being potty trained for a year with no accidents, she testified, after the January 2010 visit, Joshua regressed and "wet the bed for three nights after the visitation."[9] After the visits, she said Joshua would have "hatred toward us" but would also be clingy and fearful that Foster Parents would leave him.

Foster Mother kept a record of her telephone contacts with Mother and Father. Most of Foster Mother's telephone contacts with the biological parents were in the form of text messages with Mother. Other than text messages, between March and September 2009, there

---

[9]Foster Mother said that the March 2010 visit by Mother and Father with Joshua "really wasn't too bad."

were approximately eight telephone calls with Joshua, each a few minutes in duration. After the telephone contact with Mother or Father, Joshua experienced nightmares.

Since they received custody of Joshua, Foster Mother testified, they had received no child support from the biological parents. She knew that Father, at least, was working full-time at Kraft, and commented that Mother and Father had sent occasional gifts to Joshua.

Foster Mother said that the family lives in a mobile home with three bedrooms and two bathrooms. Foster Father works full-time delivering generators. Since the birth of their child, Foster Mother works part-time in home health care as a certified nursing assistant or CNA. Except when he is disrupted by contacts with his biological parents, Foster Mother said, Joshua is "a terrific little boy." He views the Foster Parents as his mother and father and views their home as his home, and the Foster Parents love Joshua and hope to adopt him.

Foster Mother felt that it would be harmful for Joshua to return to the custody of his biological parents. She believed there was still substance abuse in their home, and that they could not afford to have custody of Joshua. She had no specific evidence of current illegal drug usage, only methadone, but surmised from the circumstances that Mother and Father were still using illegal drugs.[10] She noted that they claimed they could not afford the required drug screens. She felt that they were not financially stable. Foster Mother conceded that she had no specific knowledge about the biological parents' home in South Carolina.

The final witness called was Foster Father. He testified that he was employed full-time, working at least forty hours per week, making approximately $14 per hour. Foster Father corroborated Foster Mother's testimony on Joshua's problems after visits with Mother and Father, noting in particular the bed wetting problem following his January 2010 visitation with them. Foster Father testified that he loves Joshua and wants to adopt and provide for the child. At the conclusion of the testimony, the Juvenile Court took the case under advisement.

On April 14, 2010 the Juvenile Court entered a final order on the matter. The Juvenile Court found clear and convincing evidence to establish four grounds for termination: (1) persistent conditions under T.C.A. § 36-1-113(g)(3)(A); (2) abandonment by willful failure to support under T.C.A. § 36-1-102(1)(A)(i); (3) abandonment by willful failure to visit under the same subsection; and (4) abandonment by failure to provide a suitable home under T.C.A. § 36-1-102(1)(A)(ii).

---

[10]Foster Mother commented: "I mean, you go so long without seeing a child and all they had to have is a clean drug screen, that kind of raises the red flag to me that there may be some drug usages."

In its factual findings, the Juvenile Court found that Mother and Father

> have made progress in reconstructing their lives since moving to South Carolina, with the signing of a lease and apparently stable employment. However, this newfound stability has not led to any improvement in the subject parent-child relationship. [Mother and Father] have not paid any child support to the [Foster Parents] apart from that seized from tax returns or deducted directly from the check to pay past support. They have not used the resources to visit the child or send gifts or supplies for the child's benefit. Finally, the most distressing of the conditions that led to removal, namely drug dependence, has not been resolved. [Mother and Father] remain in a drug treatment program and, in fact, have increased their methadone dosage over the past eight months.

As to persistent conditions, the Juvenile Court noted that the minor child had been removed out of the custody of Mother and Father since May 2008, more than the requisite six month period of removal. It further found:

> The fact that [Mother and Father] have only recently begun to get their lives back in order indicates that the conditions that led to the removal still exist. Their recent procurement of jobs, transportation and housing evidences a lack of stability that would prevent child's safe return at this time. [Mother and Father] have also failed to complete drug treatment and have increased their dosages of methadone over an eight (8) month period, evidencing that the main reason for the removal has not been cured and is unlikely to be cured to allow the safe return of the child in the near future.

Thus, the Juvenile Court found that, as of the time of trial, the conditions that led to the child's removal from the parents' home still persisted.

On abandonment by willful failure to pay child support, the Juvenile Court found that, during the four-month period preceding the filing of the termination petition, Mother and Father did not pay any child support to the Foster Parents aside from amounts deducted from payroll checks or tax returns. On abandonment by willful failure to visit, the Juvenile Court found that, during the four months preceding the filing of the petition, neither parent had any visitation with the minor child, despite the fact that Mother came to Tennessee for probation-related visits in April and November 2009. The Juvenile Court noted that any telephone contact during that time was "sporadic at best."

-11-

On abandonment for failure to provide a suitable home, the Juvenile Court found that after Joshua was removed from the custody of Mother and Father, and after the DCS permanency plan was staffed and signed, Mother and Father

> . . . exhibited difficulty in executing the action steps [in the permanency plan]. They would regularly cancel and reschedule visits with the child and never showed proof of parenting classes. Further, the alcohol and drug assessment that was part of the plan was cancelled and rescheduled no fewer than five times. This was accompanied by positive drug screens and admitted continued drug use throughout 2008.

On this basis the Juvenile Court found:

> [F]or the four months following removal, and a considerable period beyond that, DCS made reasonable efforts to assist [Mother and Father] to establish a home for the child; at the same time the parents have demonstrated a lack of concern for the child with their failure to maintain contact with the child or seek his return that it is unlikely that they will be able to provide a suitable home for the child. . . .

Finally, the Juvenile Court found that the termination of the parental rights of both Mother and Father was in Joshua's best interest, noting that the Foster Parents had been a "constant source of love and support for the minor child" and that Joshua refers to the Foster Parents as his parents. The Juvenile Court found that, "to remove him from the place he recognizes as his home and place him with individuals that he cannot even identify over the telephone would certainly be contrary to his best interest." Therefore, the Juvenile Court terminated the parental rights of both Mother and Father. From this order, Mother and Father now appeal.

#### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father and Mother argue that the Juvenile Court erred in finding clear and convincing evidence to establish the grounds for termination of their parental rights, namely, persistent conditions and abandonment. They further contend that the Juvenile Court erred in finding clear and convincing evidence that termination of their parental rights was in the best interest of the minor child.

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49

(2000); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk* 855 S.W.2d 573, 578-79 (Tenn. 193); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *DCS v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope,* 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.,* 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Termination proceedings are governed by statute in Tennessee. *In re J.C.D.,* 254 S.W.3d 432, 438 (Tenn. Ct. App. 2007). A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. T.C.A. § 36-1-113(C)(1) (2010). Once a ground for termination is established, the party seeking termination must then prove that termination of the parental rights of the biological parent is in the child's best interest. T.C.A. § 36-113(C)(2) (2010).

Because of the profound consequences of a decision to terminate parental rights, courts apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. T.C.A. § 36-1-113(C) (2010); *In re Adoption of A.M.H.*, 215 S.W.3d at 808; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *See In re M. W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt from the evidence." *In re Audrey S.,* 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. (citations omitted); *see also In re A.D.A.,* 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.,* 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's determinations as to the credibility of the witnesses. *Seals v. England/ Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. TENN. R. APP. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91. (Tenn. 1993). The appellate court then determines whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly

establishes all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.,* 228 S.W.3d at 156; *In re S.M.,* 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004).  The trial court's conclusions of law are reviewed *de novo* on the record, affording them no presumption of correctness.  *In re Tiffany B.*, 228 S.W.3d at 156; *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## ANALYSIS

## Persistent Conditions

The first ground for termination that we consider is usually referred to as "persistent conditions."  The pertinent statute provides that grounds for termination of parental rights exist when:

> (3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parents or guardian(s) still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s)in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

T.C.A. § 36-1-113(g)(3)(A)-(C) (2010).  Thus the "persistent conditions" subsection may apply if the child has been removed from the parents' custody for a period of more than six months.  If the conditions that led to the child's removal still persist,[11] preventing the child's safe return to the parents' custody and it is unlikely that the conditions will be remedied in the near future *and* continuing the parent/child relationship greatly diminishes the child's chance to have a safe permanent home, then this constitutes grounds for termination.  Here it is undisputed that, at the time of trial, Joshua had been out of his parents' custody for more than six months.

---

[11]The statute also includes other conditions that may not have led to the original removal, but nevertheless would likely "cause the child to be subjected to further abuse or neglect."  T.C.A. § 36-1-113(g)(3)(A) (2010).

From our review of the record, it appears that the original removal arose from Mother's neglect in leaving Joshua alone, and from the substance abuse of both parents. In the factual findings supporting this ground, the Juvenile Court focused on the parents' substance abuse. It found that Mother and Father "have. . . failed to complete drug treatment and have increased their dosages of methadone over an eight (8) month period, evidencing that the main reason for the removal has not been cured and is unlikely to be cured to allow the safe return of the child in the near future." The order stated that "the most distressing of the conditions that led to removal, namely, drug dependence, has not been resolved," mentioning that the parents "remain in a drug treatment program" and had increased their methadone dosage.

From our review of the record, we must conclude that the evidence does not support a finding that the ground of persistent conditions was established. We emphasize at the outset that the Foster Parents, as the petitioners, bore the burden of proving by clear and convincing evidence that the conditions that led to Joshua's removal still persisted.[12] *See* T.C.A. § 360-1-113(c)(1) (2010); *In re: Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007).

The Foster Parents in this case put on no proof regarding current substance abuse by either Mother or Father.[13] The only evidence on this issue came from Mother and Father, who maintained that they had remained free of substance abuse since they moved to South Carolina. No evidence to the contrary appears in the record.

---

[12]To the Court's dismay in reviewing the record, in the attorneys' discussion with the Juvenile Court of the proof on the ground of persistent conditions, the attorney for the Foster Parents attempted to persuade the Juvenile Court that the burden of proof was on Mother and Father to prove that they had a suitable home. After citing an unreported case to the Juvenile Court and noting that there was no home study of Mother and Father's South Carolina home, the following exchange occurred:

> THE COURT: Any proof that it is not [suitable]?
>
> MR. HASH: No, but in this case it wasn't a matter of showing that it was not; it was a matter of showing that it was.
>
> THE COURT: So you claim that burden shifted to [Mother and Father]?
>
> MR. HASH: That's correct.

This is clearly wrong, as shown by reading any number of parental termination decisions by this Court and the Tennessee Supreme Court.

[13]In her testimony on the topic, Foster Mother offered only rhetorical questions and speculation. This does not substitute for affirmative evidence.

The Juvenile Court's findings on this issue references the admitted use of methadone, pursuant to prescription, by both Mother and Father. The Juvenile Court apparently viewed this as evidence that Mother and Father "failed to complete drug treatment . . ., evidencing that the main reason for the removal has not been cured and is unlikely to be cured . . . in the near future."

First, we note that both Mother and Father submitted into evidence certificates showing that they in fact completed a substance abuse program. Thus, from the record, the trial court's finding that the parents failed to complete drug treatment is factually incorrect.

Second, it is imperative for courts handling parental termination cases to view substance abuse realistically. The power of various addictive substances over the addict has been acknowledged by this Court. *See, e.g., In re: M.J.M.*, No. M2004-02377-COA-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. April 14, 2005) (". . . we must accurately understand this challenge [the mother] faces to overcome her methamphetamine addiction. Methamphetamine is powerfully addictive. It has one of the highest recidivism rates of all abused substances.") (citation omitted).[14] Recovery from addiction will frequently entail "false starts and set backs, as well as successes and, regrettably, backsliding." *Id.* at *11. Parents who suffer from addiction "can turn their lives around," but must be given the time and opportunity to do so. *In re: D.J.R.*, No. M2005-02933-COA-R3-JV, 2007 WL 273576, at *5-6 (Tenn. Ct. App. Jan. 30, 2007) (citing *Ray v. Ray*, 83 S.W.3d 726, 734 (Tenn. Ct. App. Jan. 30, 2007)).

To the point in the case at bar, the trial court's comment that the parents had not shown that they were "cured" and the comment on the parents' methadone usage raises some concern. Drug addiction is not a condition that is "cured"; parents address it by managing it, that is, by following an established treatment program and refraining from the use of the drugs. *In re: M.J.M.*, 2005 WL 873302, at *11. Methadone is a recognized addiction therapy, and both Mother and Father testified that their use of methadone was therapeutic, pursuant to prescription, and part of their ongoing effort to manage their addiction. The Foster Parents submitted no expert testimony or other evidence to the contrary. The Juvenile Court noted that their dosage of methadone had increased, but the record contains no evidence explaining the significance, if any, of this fact.

In short, from our review of the record, the Foster Parents did not carry their burden of proving this ground for termination, and the Juvenile Court's finding on this ground must be reversed.

---

[14]The record in this case indicates that both Mother and Father tested positive for, *inter alia*, methamphetamine.

**Abandonment**

*Failure to Pay Support*

The next ground for termination found by the Juvenile Court was abandonment for failure to pay support. The pertinent statute provides for termination if the trial court finds:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

T.C.A. § 36-1-102(1)(A)(i) (2010); *see* T.C.A. § 36-1-113(g)(1) (2010). The terms "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" are further defined in the statute:

> (D) For purposes of this subdivision (1), "willfully failed to support or "willfully failed to make reasonable payments towards such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child.

T.C.A. § 36-1-102(1)(D) (2010).

At the core of the definition of abandonment is the concept of "willfulness." A parent may not be found to have abandoned the child unless the parent has "willfully" failed to visit or support the child for a period of four consecutive months. *In re Adoption of Muir*, M2004-02652-COA-R3-CV, 2005 WL 3076896, at *4 (Tenn. Ct. App. Nov. 16, 2005). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id*. at *5 (citations omitted). This Court has explained the concept of willfulness:

> [W]illfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent have acted with malice or ill will. *In re Audrey S.,* 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it

-17-

consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *Id*. Willful conduct is the product of free will rather than coercion. *Id*. A person acts willfully if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. *Id*. at 863-64. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id*. at 864. (citing *In re M.J.B.*, 140 S.W.3d 543, 654 (Tenn. Ct. App. 2004)).

*In re J.G.H.*, *Jr.,* No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *15 (Tenn. Ct. App. Aug. 17, 2009).

On appeal, Mother asserts that Father paid child support to the State of Tennessee on behalf of both of them, because she was unemployed, but they did not pay child support to the Foster Parents because no child support was ordered by the trial court. Therefore, she claims, her failure to pay child support was not willful. Similarly, Father claims that his failure to pay child support to the Foster Parents was not willful because he was not aware of any order requiring him to pay child support. Father only became aware that he had a responsibility to pay child support once monies were garnished from his paycheck.

Here, it is undisputed that neither Mother nor Father paid any support for Joshua to the Foster Parents during the four-month period preceding the filing of the termination petition.[15] It is also undisputed that they had the ability to pay modest child support. In their testimony, both Mother and Father professed to be unaware of any duty to pay support to the Foster Parents, explaining that there was no order requiring them to pay such support, despite the fact that both permanency plans included specific provisions requiring them to pay support, and despite the fact that the criteria for the termination of their parental rights were explained by DCS.

The Supreme Court has held that, in the context of termination proceedings initiated by a private party as opposed to DCS, there need not be a showing that the biological parent was aware of the consequences of a failure to visit or support their child, in order to find willfulness. *In Matter of M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009). This is because persons are presumed to know the law, and a parent should know that he or she has such responsibilities for the child. *Id*.(citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Bd. of Edu. v. Shelby County*, 339 S.W.2d 569, 584 (Tenn. 1960).

---

[15]The record indicates that Father's South Carolina wages were garnished for back child support payable to DCS. The garnishment was instituted after the pivotal four-month period, so we do not consider it in our analysis.

Thus, we can presume that Mother and Father were aware of their legal obligation to pay child support of Joshua.

However, in reviewing the record, a problem emerges. As noted above, in late March 2009,[16] the Juvenile Court entered an order removing Joshua from DCS protective custody, granting custody to the Foster Parents, and giving Mother and Father the right to supervised visitation if they provided a clean drug screen. The order also states that "the issue of child support is reserved for later hearing(s) until such time that the child support enforcement office may be present and pursue child support if they so desire." Although the testimony indicates that garnishment proceedings were instituted at a later date, the Juvenile Court's written order contains nothing indicating hearings or any other judicial resolution of the reserved issue of Mother's and Father's child support obligation. The March 2009 order, of course, is dated after any provision in the permanency plans on child support. In the record, it appears that the March 2009 order remained in effect during the pivotal four-month period and, indeed, through the trial in the Juvenile Court below.

As noted above, to establish grounds for termination on the basis of failure to support, the evidence must establish clearly and convincingly that the failure to support was willful. The Juvenile Court order in effect during the pivotal time period may have obfuscated the parties' legal obligation to pay support, and muddies the evidence on the willfulness of their admitted failure to pay. Thus, we must conclude that the Juvenile Court's finding that the failure to support was willful is not supported by clear and convincing evidence in the record. Therefore, the Juvenile Court's holding on this ground must be reversed.

### *Failure to Visit*

The Juvenile Court also terminated the parental rights of Mother and Father on the ground of willful failure to visit. It is undisputed that neither Mother nor Father visited Joshua during the four-month time period preceding the filing of the termination petition in September 2009. By that time, Mother and Father had moved to South Carolina. The Juvenile Court noted that Mother and Father chose to relocate to South Carolina "[d]espite the fact that [the DCS] case worker . . . emphasized the difficulty that such a move would cause in visitation," and despite having been informed that failure to visit Joshua could constitute grounds for termination of their parental rights. The Juvenile Court noted that Mother and Father "have made progress in reconstructing their lives since moving to South Carolina," but found that they "have not used the [new] resources to visit the child." It pointed out that Mother had even traveled to Tennessee for a probation visit during the

_____

[16]In the record, the order has a "Received" stamp on the front dated March 27, 2009, and the last page of the order has a "Filed" stamp dated March 30, 2009.

pivotal time frame, but nevertheless did not visit Joshua on that trip. It concluded that the parties' failure to visit was willful.

In this appeal, Mother argues that she did not visit the minor child from March 2009 through December 2009 because of "financial difficulties and the long travel distance from South Carolina to Tennessee and because she had gotten sick on one occasion she was supposed to have a visit." Accordingly, Mother maintains that her failure to visit was not willful.

Father argues that the Juvenile Court's finding of willful failure to visit the child during the four month period prior to the filing of the petition to terminate was in error because Father had three contacts with the minor child via telephone during that time. Father claims "that he made efforts to get visits set," but was deterred by the Foster Parents in scheduling these visits if it did not fit with their schedule. He characterized his ability to visit with the minor child as being at the "whim" of the Foster Parents. Given the alleged interference of the Foster Parents with his visitation with the minor child, Father contends that his failure to visit the minor child was not willful.

In this case it is undisputed that Mother and Father had no visits with Joshua from March 2009 until January 2010. Although Mother came to Tennessee in April and November for probation visits, she did not visit the minor child on these trips. The Foster Parents filed the petition for termination in September 2009, approximately six months following the parents' last visit with the minor child. Although it appears that Mother and Father had some telephone contact with the child, the Juvenile Court found that any "telephone contact was sporadic at best."

The issue of the parents' failure to visit must be considered in the context of their move to South Carolina. In her testimony, Mother explained that, in Tennessee, she and Father lacked family support and were in the company of friends who did not support their efforts to refrain from substance abuse. In contrast, in South Carolina, they had active support from Mother's family and had made great strides in achieving freedom from substance abuse and in obtaining stable housing and employment.

This Court has recognized that a parent's decision to relocate out of the jurisdiction may be a reasonable decision, particularly where the move may reasonably be expected to help the parent achieve the goals of the permanency plan. For example, in *State of Tenn. Dept. of Children's Services v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726 (Tenn. Ct. App. Aug. 13, 2003), after removal of her child from her custody by DCS, the mother moved from Tennessee to Texas, where she had family. *Id.* at *4-5. After that, the mother did not visit the child. The trial court was critical of the mother's decision to relocate and found abandonment by failure to visit. *Id.* at *7-8. The appellate court found that the

mother's move did not constitute willful abandonment, noting that the relocation was "an apparent attempt to accomplish the goals placed on her by DCS" and regain custody of her child. *Id.* at *11. Under the facts of that case, the appellate court found that the mother's efforts to stay in contact with her child were not facilitated by DCS and in fact were impeded by DCS. *Id.* at *13.

In this case, it appears that the decision of Mother and Father to relocate to South Carolina was not unreasonable, and in fact appeared to achieve its purpose. The evidence indicates that, after the move, Mother and Father made significant progress in securing stable housing and employment and in gaining control of their substance abuse. Moreover, we recognize that, after the move, the parents' youngest child was born and they had the challenges associated with settling into a new home, finding employment, and raising an infant while addressing their substance abuse.

Nevertheless, Mother and Father clearly understood that, despite their relocation, they had an obligation to visit Joshua and maintain contact with him. Unlike DCS, the petitioner Foster Parents had no obligation to arrange or even encourage visitation; their obligation was to cooperate in the parents' visits and not impede them. Although both Mother and Father testified that the Foster Parents were uncooperative in arranging visitation, the Juvenile Court clearly did not credit these assertions. On appeal, we give great deference to the Juvenile Court's assessment of the witnesses' credibility, so in this case we defer to the Juvenile Court's refusal to credit Mother's and Father's testimony on this point.

On this basis, the Juvenile Court found that Mother and Father offered no explanation that justified their utter failure to visit Joshua at all during the four months that preceded the filing of the termination petition. From our review of the record, even considering the challenges they dealt with in South Carolina, we must agree.

We can only conclude that neither parent appropriately prioritized the need to visit their son in Tennessee. Such visitation is not a rote statutory requirement; it is necessary to maintain the thread of the parent-child relationship and pave the way for the return of the child to the parents' custody. We have noted that an absence of contact between parent and child for an extended period of time can lead to, in effect, the "death" of the relationship. ***See In re: A.M.H.***, No. W2004-01225-COA-R3-PT, 2005 WL 3132353, at *106 (Tenn. Ct. App. Nov. 23, 2005) (dissent) majority *rev'd*. at 215 S.W.3d 793 (Tenn. 2007). This is particularly true for a child as young as Joshua, only two years old during the four-month time period in question.[17]

---

[17]Particularly in light of Joshua's age, we find that the sporadic short telephone conversations during the
(continued...)

From our careful review of the record, with appropriate deference to the Juvenile Court's determinations of credibility, we must conclude that the record contains clear and convincing evidence to support the Juvenile Court's finding of abandonment by willful failure to visit.

### *Failure to Provide a Suitable Home*

The Juvenile Court also terminated the parental rights of Mother and Father on the ground that Mother and Father abandoned the child by failing to provide a suitable home. This ground for termination is set forth in T.C.A. § 36-1-102(1)(A)(ii) (2010), which states:

> (A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

The trial court found, "that for the four months following removal, and a considerable period beyond that, DCS made reasonable effort to assist the [Mother and Father] to establish a

---

[17](...continued)
determinative time period constituted at most inconsequential "token" visitation. *See* T.C.A. § 36-1-102(1)(C) (2010).

home for the child; . . . and that it is unlikely that they will be able to provide a suitable home for the child at an early date." We note that, for this type of abandonment, the pertinent time period is not limited to the four-month period preceding the filing of the petition.[18] The record contains very little evidence on the suitability of the parents' physical home, either in Tennessee or in South Carolina. Certainly, the Foster Parents did not present clear and convincing evidence on the physical suitability of either home occupied by Mother and Father.

We note that abandonment by failure to provide a suitable home is not limited to the parents' physical home; a home may be rendered unsafe and unsuitable by the conduct of its occupants. *See In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *10 (Tenn. Ct. App. Feb. 12, 2010) *(perm. app. den'd.* 2010). In this case, the Juvenile Court found that after Joshua was removed from his parents' home and after the permanency plan was staffed, Mother and Father did not execute the steps required of them in the plan. In particular, the Juvenile Court found that, while in Tennessee, Mother and Father continually put off obtaining an A&D assessment and had "positive drug screens and admitted continued drug use throughout 2008." However, the proof also shows that, after they moved to South Carolina, Mother and Father gained some control over their addiction and curtailed their use of illegal substances. Courts should consider past misconduct, but should also consider parents' more recent behavior and circumstances. *In re: D.J.R.*, 2007 WL 273576, at *4-5. Therefore, we must conclude that the record does not contain clear and convincing evidence on this ground.

On this basis, we find that the Juvenile Court's finding on the ground of abandonment by failure to provide a suitable home must be reversed.

### Best Interest

To terminate the parental rights of a biological parent, the trial court must also find by clear and convincing evidence that termination is in the best interest of the child. T.C.A. § 36-1-113(c) (2010). T.C.A. § 36-113(i) sets forth the factors considered in determining whether termination is in the best interest of the child; however this list is not exhaustive.[19] *In re*

---

[18]The statutory time period for measuring DCS's reasonable efforts is the four-month period following removal. T.C.A. § 36-1-102(1)(A)(ii) (2010).

[19] The statute provides as follows:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (continued...)

***M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing ***State v. T.S.W.***, No. M2001-01735-COA-R3-JV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)).

In this appeal, Mother and Father assert that they have made an adjustment in their circumstances, such that it is in the best interest of the minor child to reside in their home. Father asserts that he no longer uses drugs, but instead maintains a stable home and stable employment. He additionally asserts that the trial court's concern about his methadone use

---

[19](...continued)

       (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

       (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

       (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

       (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

       (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

       (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family household;

       (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

       (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

       (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i)(1)-(9) (2010).

is speculative in nature. He and Mother also assert that the Foster Parents did not provide evidence that the maintenance of the parent-child relationship would be psychologically, physically, or emotionally detrimental to the minor child.

To the contrary, the record contains ample evidence that termination of the parental rights of Mother and Father is in Joshua's best interest. The evidence clearly shows that Mother and Father lack any meaningful relationship with the minor child. In fact, the evidence from several witnesses indicates clearly that contacts between Joshua and his biological parents result in considerable distress to Joshua, causing regression, nightmares, and fearfulness.

In contrast, as found by the Juvenile Court, the Foster Parents "have been a constant source of love and support for the minor child since his removal from" the home of Mother and Father. The Juvenile Court observed that the Foster Parents "have fulfilled the role of parent for the minor child for the vast majority of his life, and the minor child recognizes this fact by calling him his parents. To remove him from the place he recognizes as his home and place him with individuals that he cannot even identify over the telephone would certainly be contrary to his best interest." We agree. From our review of the record, we affirm the Juvenile Court's finding that termination of the parental rights of Mother and Father is in the child's best interest.

## CONCLUSION

The decision of the Juvenile Court is affirmed in part and reversed in part. Costs on appeal shall be taxed to the Appellants, Jennifer N.C. and Joshua M.S. and their sureties, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

-25-